195 F.3d 732 (4th Cir. 1999)
 IRVING HOUSTON HAWKINS, Petitioner-Appellant,
v.
FRANKLIN FREEMAN, Secretary for the North Carolina Department of Correction, J. V. TURLINGTON, Superintendent, Pender Correctional Institute, Respondents-Appellees.
AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION, INCORPORATED, Amicus Curiae.
 No. 96-7539 (CA-95-237).
 UNITED STATES COURT OF APPEALS, FOR THE FOURTH CIRCUIT.
 Argued: June 9, 1999.
Decided: November 9, 1999.
 
 Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.
 Richard C. Erwin, Senior District Judge.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 COUNSEL ARGUED: Neal Lawrence Walters, UNIVERSITY OF VIRGINIA SCHOOL OF LAW APPELLATE LITIGATION CLINIC, Charlottesville, Virginia, for Appellant. Ralph S. Tyler, HOGAN & HARTSON, L.L.P., Baltimore, Maryland, for Amicus Curiae. Clarence Joe DelForge, III, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees. ON BRIEF: Kelly M. Baldrate, Third Year Law Student, James D. Jones, Third Year Law Student, UNIVERSITY OF VIRGINIA SCHOOL OF LAW APPELLATE LITIGATION CLINIC, Charlottesville, Virginia, for Appellant. Maura L. DeMouy, Nicholas G. Stavlas, HOGAN & HARTSON, L.L.P., Baltimore, Maryland, for Amicus Curiae. Michael F. Easley, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.
 Before WILKINSON, Chief Judge, WIDENER, MURNAGHAN, ERVIN,* NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL, MOTZ, TRAXLER, and KING, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 Affirmed by published opinion. Senior Judge Phillips wrote the majority opinion, in which Chief Judge Wilkinson, Judge Widener, Judge Niemeyer, Judge Hamilton, Judge Luttig, Judge Williams, Judge Michael, Judge Motz, Judge Traxler and Judge King joined. Judge Murnaghan wrote a dissenting opinion.
 OPINION
 PHILLIPS, Senior Circuit Judge:
 
 
 1
 When officials of the North Carolina Parole Commission discovered that twenty months earlier they had mistakenly granted parole to Irving Houston Hawkins, a convicted habitual felon who was not at the time nor yet eligible for parole under applicable law, it revoked the parole and ordered Hawkins's re-incarceration. After unsuccessfully challenging this action in state court, Hawkins sought federal habeas corpus relief, claiming that his re-incarceration violated a liberty interest protected by the substantive component of the Fourteenth Amendment's due process clause. The district court rejected the constitutional claim and dismissed the habeas action. On Hawkins's appeal to this court, a divided panel reversed, holding that the State's action violated Hawkins's substantive due process right and ordering his release on the parole erroneously granted. 166 F.3d 267 (1999). On the State's suggestion, we vacated the panel opinion, reheard the appeal en banc, and now hold, affirming dismissal of the habeas action, that the State's act of revoking Hawkins's parole and re-incarcerating him violated no substantive due process right.
 
 
 2
 * On February 27, 1981, Irving Houston Hawkins was convicted by jury trial in a North Carolina Superior Court of the sale and delivery of cocaine, possession with intent to sell cocaine, and--on the basis of previous felony convictions of rape and aggravated assault with intent to commit rape, and armed robbery--of being an habitual felon. He was sentenced to fifty years imprisonment on the sale and delivery of cocaine and habitual felon charges and to ten years on the possession with intent to sell cocaine charge. The ten-year sentence was to be served, along with sixty days on an earlier conviction for driving under the influence, concurrent with the fifty-year sentence. His ensuing confinement in the North Carolina prison system was his fifth in that system.
 
 
 3
 At the time of Hawkins's conviction, relevant state law required that habitual felons serve 75% of their sentences before becoming eligible for parole consideration. See N.C. Gen. Stat. § 14-7.6 (as of conviction date). Though this parole-eligibility provision was amended later in 1981 to reduce the time of required service before parole eligibility from 75% of sentence to a flat seven years, the amended version was effective only as to offenses committed after July 1, 1981. It is therefore undisputed that Hawkins's legally-prescribed parole eligibility date remained April 20, 2018.
 
 
 4
 Early in his confinement, Hawkins was, however, given inaccurate advice about his parole eligibility date by a member of the Parole Commission. In June, 1982, presumably acting on the basis of an internal memorandum in Commission files, then-Commissioner Walter T. Johnson, Jr. advised Hawkins by letter that the 75% rule of § 14-7.6 controlled his parole eligibility and that he would become eligible after 30 years of service on October 20, 2010. And, the letter alluded to the possibility that Hawkins "may" earlier have been advised of an even earlier date.
 
 
 5
 This mis-advice was later corrected by a letter of September 7, 1983, to Hawkins from a Staff Parole Analyst which correctly identified the parole eligibility date as April 20, 2018, and apologized for the "terrible disappointment" this correction would cause. Hawkins was therefore correctly informed as of September 1983 that under the 75% rule of pre-amendment § 14-7.6, he must serve thirty-seven and a fraction, not thirty, years of his fifty-year sentence before becoming eligible for parole consideration on April 20, 2018.
 
 
 6
 Some nine years later, after Hawkins had served almost eleven years of his fifty-year sentence, new confusion respecting his parole eligibility arose in the Parole Commission. In a letter dated March 13, 1992, a Parole Case Analyst advised Hawkins that he was being considered for "Intensive Community Service Parole" under the community service parole provision of N.C. Gen. Stat.§ 15A-1371. Here again, the underlying assumption that Hawkins was then (or ever) eligible for parole under this provision was simply wrong, as all parties now concede. The legally-imposed reality remained as it had been: Hawkins's parole-eligibility date remained that dictated by pre-amendment § 14-7.6, April 20, 2018.
 
 
 7
 Nevertheless, the Commission proceeded to consider Hawkins for community service parole under the inapplicable provisions of § 15A1371, and released him on its mistakenly assumed authority on July 6, 1992, after he had served almost eleven and a half years of his fifty year sentence. His release was recommended by a Parole Case Analyst who, after noting that there was "some concern as to Mr. Hawkins' release, due to . . . a past history of sexual assaultive behavior," cited as the basis for his recommendation the facts that during his imprisonment Hawkins had only four rule violations, none of which was assaultive; that he had a stable work history before his imprisonment; that while imprisoned he had earned by extension work a Bachelor of Science degree in business management from Shaw University; that there was a "prison crisis"; and that upon release Hawkins would be "placed on intensive supervision."
 
 
 8
 Upon his release, Hawkins lived by pre-arrangement with a brother in Greensboro, North Carolina, who had secured for him a job as fork-lift operator with the brother's employer, Cone Mills. Hawkins held the job regularly, with good performance evaluations, throughout his period of release. During that time, he violated no behavioral conditions of his parole, but did fall significantly behind on both the community service and monetary obligations of his special parole, to the point that the Commission threatened revocation of his parole--a threat that was, however, overtaken by more drastic developments.
 
 
 9
 On March 24, 1994, some twenty months after Hawkins's release, the Parole Commission's Manager of Combined Records, in the course of reviewing records, discovered the Commission's error in believing that Hawkins had been eligible for the community service parole granted him. She immediately notified the Commission's Chief of Operations, who the same day notified the Commission Chairman of the error and recommended that Hawkins's parole be "rescind[ed]" and that he be re-incarcerated. Acting on this recommendation, Commission officials that same day issued a certificate rescinding the 1992 parole order and a warrant for Hawkins's arrest. Hawkins was arrested on this warrant the next day, March 25, 1994, and re-incarcerated after waiving a preliminary parole revocation hearing.
 
 
 10
 Pursuant to statute, Hawkins was given notice of and afforded a formal hearing before the Commission on the question of his parole revocation. At the hearing on June 8, 1994, Hawkins was represented by counsel, former Parole Commissioner Walter T. Johnson, Jr., now an attorney in private practice. Before the Commission, the State simply presented the facts of its legal mistake in releasing Hawkins under the community service parole statute and attorney Johnson argued against revocation and for release on legal and humanitarian grounds. Following the hearing, the Commission deferred decision to allow Hawkins's counsel to file documentary materials supporting Hawkins's position. The supporting materials consisted essentially of affidavits documenting Hawkins's trouble-free time on parole and his favorable job evaluations, together with an attestation by Hawkins to his belief in his rehabilitation by reason of religious conversion. The State did not formally contest any of these submissions, continuing to rely simply on the fact that his release had not been authorized by law and that he had not yet completed service of his legally imposed sentence nor become legally eligible for parole consideration. The Commission then formally revoked Hawkins's parole on the sole basis that it had not been legally authorized when granted. Hawkins was then notified that he must serve 75% of his fifty-year sentence and that his "current parole eligibility date" was April 20, 2018, which had the effect of according credit for his time on erroneous parole release as time served on sentence.
 
 
 11
 Hawkins, now represented by new counsel, N.C. Legal Services, Inc., filed in the North Carolina Court of Appeals a two-pronged challenge to the Parole Commission's decision. By a"Petition for Writ of Certiorari," seeking direct review of the Commission's administrative decision, he challenged the decision on various grounds. By a "Petition for Writ of Habeas Corpus," he sought release on the ground that his imprisonment was in violation both of state statute and Constitution and of "the Due Process Clause of the United States Constitution." The North Carolina Court of Appeals, after requesting a response by the State to the petition for habeas corpus, summarily denied both petitions, and the North Carolina Supreme Court then similarly denied his petition for habeas corpus in that court. See Hawkins v. Freeman, 460 S.E. 2d 331 (N.C. 1995).
 
 
 12
 Still represented by his state court counsel, Hawkins brought this federal habeas action under 28 U.S.C. § 2254, claiming that in revoking his parole and re-incarcerating him, the State violated a substantive due process right secured by the due process clause of the Fourteenth Amendment. Following discovery, the State moved for summary judgment. A United States magistrate judge concluded in an extended memorandum opinion that the Parole Commission's conceded course of administrative error leading up to and culminating in Hawkins's erroneous release and later re-incarceration "d[id] not raise any inference of malicious or gross error" but constituted"mere negligence and mistake." On that basis, the magistrate judge concluded that the conduct violated no substantive due process right of Hawkins and recommended that summary judgment be granted to the State. A United States district judge adopted the recommendation following de novo review of the record. This appeal by Hawkins followed.
 
 II
 
 13
 Courts now considering any claim of substantive due process violation must look for principal guidance to the Supreme Court's most recent deliverances on the concept in County of Sacramento v. Lewis, 118 S. Ct. 1708 (1998) (holding no violation of substantive due process where high-speed police chase resulted in motorcycle passenger's death), and Washington v. Glucksberg, 521 U.S. 702 (1997) (upholding state's statutory ban on assisted suicide as not violative of substantive due process). While these decisions in the main confirmed and built on longstanding substantive due process jurisprudence, each gave new emphasis to limiting aspects of the concept that are of special relevance to the claim made in this case. And, though both evoked a multiplicity of opinions reflecting continuing disagreements even within Court majorities respecting the precise methodology for assessing such claims, we understand them to establish or reaffirm for our purposes the following core propositions.
 
 
 14
 1. First off, they remind yet again that, as a general proposition, courts must be "`reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this uncharted area are scarce and open-ended,'" Glucksberg, 521 U.S. at 720 (quoting Collins v. Harker Heights, 503 U.S. 115, 125 (1992)), which means that the courts must "`exercise the utmost care whenever we are asked to break new ground in this field,[Collins, 503 U.S. at 125], lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [judges], [Moore v. City of East Cleveland, 431 U.S. 494, 502 (1977)].'" Glucksberg, 521 U.S. at 720; see also Lewis, 118 S. Ct. at 1714 (noting traditional reluctance of Court to expand concept).
 
 
 15
 2. Depending upon whether the claimed violation is by executive act or legislative enactment, different methods of judicial analysis are appropriate. See Lewis, 118 S. Ct. at 1716. This is so because there are different "criteria" for determining whether executive acts and legislative enactments are "fatally arbitrary," an essential element of any substantive due process claim. Id.
 
 
 16
 In executive act cases, the issue of fatal arbitrariness should be addressed as a "threshold question," asking whether the challenged conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Id. at 1717 n.8. If it does not meet that test, the claim fails on that account, with no need to inquire into the nature of the asserted liberty interest. If it does meet the threshold test of culpability, inquiry must turn to the nature of the asserted interest, hence to the level of protection to which it is entitled. See id.[1]
 
 
 17
 If the claimed violation is by legislative enactment (either facially or as applied), analysis proceeds by a different two-step process that does not involve any threshold "conscience-shocking" inquiry. The first step in this process is to determine whether the claimed violation involves one of "those fundamental rights and liberties which are, objectively, `deeply rooted in this Nation's history and tradition,'" Glucksberg, 521 U.S. at 720-21 (quoting Moore, 431 U.S. at 503), and "`implicit in the concept of ordered liberty,' such that `neither liberty nor justice would exist if they were sacrificed.'" Id. (quoting Palko v. Connecticut, 302 U.S. 319, 325, 326 (1937)). The next step depends for its nature upon the result of the first. If the asserted interest has been determined to be "fundamental," it is entitled in the second step to the protection of strict scrutiny judicial review of the challenged legislation. See id. at 721 (observing that fundamental liberty interest is violated by legislation that infringes it unless the legislation is "`narrowly tailored to serve a compelling state interest'") (quoting Reno v. Flores, 507 U.S. 292, 302 (1993)). If the interest is determined not to be "fundamental," it is entitled only to the protection of rational-basis judicial review. See id. at 728.
 
 
 18
 Critical to the "fundamental interest" inquiry is the requirement that it be conducted on the basis of a "careful description of the asserted fundamental liberty interest." Id. at 720 (quotation omitted). By this means, the "Nation's history, legal traditions, and practices . . . provide the crucial `guideposts for responsible decision-making,'" id. at 721 (quoting Collins, 503 U.S. at 125), that would be threatened by analyzing the claimed right at too general a level. See id. at 722 (rejecting claimants' suggested description of asserted right to assisted suicide as being one "to die," or"to choose how to die," or to "control one's final days," instead analyzing right more narrowly as one "to commit suicide which itself includes a right to assistance in doing so").[2]
 
 III
 
 19
 Guided by the Glucksberg and Lewis directives on analytic method, we now consider the substantive due process claim made by Hawkins and rejected by the district court. Because it was rejected by summary judgment, we review the district court's ruling de novo. See Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1004 (4th Cir. 1987).
 
 
 20
 As prelude, we note a late development in the case that shapes the analysis we undertake. Up until oral argument on rehearing en banc, all parties to the litigation had assumed that the constitutional challenge was directed--and properly directed--at the decision of the Parole Commission to revoke Hawkins's parole and re-incarcerate him: an executive act. The habeas claim was so pleaded and presented to the district court, was so considered and decided by that court, and was so argued in the appellate briefs filed in this court. On that basis, all parties (and the original panel of this court) had further assumed, once Lewis had prescribed the discrete methodology for analyzing executive-act claims, that that methodology applied here.
 
 
 21
 At oral argument on the rehearing en banc, however, those assumptions were drawn in question. In response to questioning by the court, counsel for the State suggested that the Parole Commission had no discretion to act but as it did; that under controlling state law, it had no power but to revoke a mistakenly granted parole and re-incarcerate. From this, further colloquy between court and counsel suggested that if this were the legal reality, the true target of the state-action claim was whatever legislative enactment dictated the decision as a purely ministerial non-discretionary one by the Parole Commission. And, on that view of things, it was suggested that the proper method for analyzing Hawkins's claim would be that dictated by Glucksberg rather than that of Lewis.
 
 
 22
 This belated development raises several problems, both procedural and substantive, that we believe require recognition. The first is whether we should consider at all this theory first raised on appeal, whatever its arguable merit. We have discretion to do so, but for very good reasons ordinarily do not. See Singleton v. Wulff, 428 U.S. 106, 119-21 (1976); Hormel v. Helvering, 312 U.S. 552, 556-57 (1941). Beyond that preliminary procedural concern, lie two difficult substantive questions that would arise were the theory to be addressed. The first is the validity of the premise that a ministerial executive act cannot ever be the proper target of a substantive due process claim; that such a claim must always be directed at whatever legislation imposed the duty; and that, in consequence, whether such an executive act was ministerial or discretionary determines the appropriate method for analyzing such a claim. No legal authority for the premise is suggested or is immediately apparent and we think it by no means self-evident despite its first-blush logic. Certainly it must be the case that a ministerial duty could be performed in a way contrived by the actor not to further the governmental interests on which it rested but simply to "oppress" its target through an "abuse" of the executive power. See Collins, 503 U.S. at 126 (so characterizing the essence of conscience-shocking executive conduct). Indeed, this might well represent the point at which executive conduct, whether discretionary or ministerial, passes into the realm of conscience-shocking arbitrariness.
 
 
 23
 If the premise were, however, accepted arguendo , there would then be the difficulty of determining on the present record whether the Parole Commission decision was a purely ministerial or discretionary one. None of the state statutes that speak most directly to the authority of the Commission to grant, administer, and revoke paroles, see N.C. Gen. Stat. §§ 15A-1373-74, -76, speaks directly to its power respecting paroles granted without legal authority. Hence, none either directly requires revocation of all mistakenly granted paroles, or directly prohibits it, or grants the Commission discretion in the matter. And, the Commission's handling of the revocation procedure here is too ambivalent to serve as any trustworthy guide to its understanding of the nature of its power. Forced to decide the question, we therefore could only do so by implication of an unexpressed legislative intention unaided by responsible agency interpretation, a generally disfavored judicial undertaking that would seem an intractable one here.
 
 
 24
 Having noted the belated suggestion and the problems its direct consideration would entail, we think that we can properly avoid and reserve decision on each of the problems in deciding this appeal. For we are satisfied that whether the claim is analyzed under the Lewis or Glucksberg methodologies, it fails as a matter of law. To explain, we analyze it in turn on the alternative assumptions.
 
 A.
 
 25
 We first assume that the claim is properly analyzed as one challenging as an executive act the Parole Commission's decision to revoke Hawkins's parole and re-incarcerate him. On that assumption, we consider as a threshold question whether that act was, under the circumstances, "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Lewis , 118 S. Ct. at 1717 n.8.
 
 
 26
 This "shocks-the-conscience" test, though long and frequently used since its first application to a "substantive due process" challenge to executive conduct in Rochin v. California, 342 U.S. 165 (1952), remains an admittedly imprecise one in formulation. See Lewis, 118 S. Ct. at 1717 (describing test as "no calibrated yard stick"); id. at 1722 (Kennedy, J., concurring) (describing as "laden with subjective assessments"). But, as Lewis also took pains to point out, over time and through its various applications, its intended meaning has been considerably fleshed out and some objective factors have emerged to guide and constrain its applications. See id. at 1716-20.
 
 
 27
 Of primary importance to understanding the standard's meaning and purpose is the fact that it derives ultimately from the "`touchstone of due process [which] is protection of the individual against arbitrary action of government,'" id. at 1716 (quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)), whether in matters of procedure or substance. As applied to claims of executive-act violations, it therefore seeks to determine as a threshold matter whether the executive conduct challenged was "fatally arbitrary" in this constitutional sense. For if the conduct does not have that character, there is no need to inquire further whether the right allegedly violated was one entitled by tradition and precedent to protection against conduct that did. See id. at 1717 n.8 ("Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action . . . .").
 
 
 28
 Over time, the Supreme Court has elaborated on the kind of executive conduct that fairly can be said to "shock the conscience," to be "fatally arbitrary in the constitutional sense." It is conduct that involves "abusing [executive] power, or employing it as an instrument of oppression." Collins, 503 U.S. at 126 (quotation omitted). More objectively, it is conduct more blameworthy than simple negligence, which never can support a claim of substantive due process violation by executive act. See Lewis, 118 S. Ct. at 1718 (citing Davidson v. Cannon, 474 U.S. 344, 348 (1986)). While intentional conduct is that "most likely" to meet the test, that alone will not suffice; the conduct must be "intended to injure in some way unjustifiable by any government interest." Id. (emphasis added). And, because specific conduct that in one context would meet the test might not in another, application of this standard "demands an exact analysis of circumstances." Id. at 1718.
 
 
 29
 As a first step in assessing whether the executive act at issue here meets this stringent test, we should look to see whether any benchmarks can be found in the way executive officials and courts reviewing their actions generally have responded to comparable situations. See id. at 1717 n.8 (suggesting importance to shocks-the-conscience inquiry of "an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them").
 
 
 30
 When we do so, the first fact encountered is that erroneous release (and delayed incarceration) of prisoners is a surprisingly widespread and recurring phenomenon in both state and federal penal systems. A raw indication of its extent and persistence is conveyed by a recent academic comment that identifies over one hundred such cases running back to 1895, a figure that surely must represent only a fraction of a much larger number of such occurrences not all of which result in litigated and reported cases. See Gabriel J. Chin, Getting Out of Jail Free: Sentence Credit for Periods of Mistaken Liberty, 45 Cath. U. L. Rev. 403 (1996) (collecting cases).[3]
 
 
 31
 We start then with awareness that the erroneous release here was not so unique an occurrence in general penal administration as to suggest arbitrariness in the challenged conduct by that fact alone.
 
 
 32
 Much more significant is the revelation from the reported cases that once such an administrative error has been discovered, the routine, seemingly invariable, executive practice has been to incarcerate, rejecting any claim of entitlement to freedom.[4] Neither, therefore, was the decision to re-incarcerate here, rejecting the administratively advanced claim and plea for freedom, so much at odds with customary executive practice as to suggest arbitrariness on that account alone.
 
 
 33
 When we look to pre-Lewis judicial decisions addressing constitutional challenges[5] to this seemingly invariable executive practice, we get little guidance for applying the threshold conscience-shocking test now mandated by Lewis. First off, there are no such constitutional decisions by the Supreme Court or by this court, hence none having precedential force for us. Almost all brought to our attention by the parties or discovered by our research apply a unique"waiver of jurisdiction" theory that bears but scant resemblance to the rigorous substantive due process regime now prescribed--in both its "arbitrariness" and "fundamental-interest" elements--by Glucksberg and Lewis.
 
 
 34
 Commonly traced in origin to the Fifth Circuit's decision in Shields v. Beto, 370 F.2d 1003 (5th Cir. 1967), this theory employs the fictive notion that by prolonged failure to incarcerate a convict who "owes it time" (either original or "interrupted") a government may "waive its jurisdiction" to do so, thereby making any later incarceration one effected without jurisdiction and so a violation of due process. As originally formulated and applied in Shields,[6] the theory seemed to require nothing more than prolonged inaction by government to prove a due process violation (presumably "substantive"). Undoubtedly sensing that if so understood the rule could not pass muster as one of constitutional stature, the Fifth Circuit took the occasion some six years later in Piper v. Estelle, 485 F.2d 245 (5th Cir. 1973) (per curiam), to cabin in that aspect of the rule concerned with the required level of government culpability. Emphasizing that"lack of eager pursuit" or "lack of interest" is not enough, Piper held that "the . . . action must be so affirmatively wrong or [the] inaction so grossly negligent that it would be unequivocally inconsistent with fundamental principles of liberty and justice to require [that the"time owed"] be served . . . ." Id. at 246 (quotation omitted). It is Piper's formulation that has since been used by courts applying this "waiver of jurisdiction" theory to constitutional due process claims. While that formulation surely moved in the direction of the conscience-shocking standard mandated in Lewis, it as surely fails to embody the full stringency of that standard's requirement that to be "conscience-shocking," "arbitrary in the constitutional sense," an executive act must be not only "wrong," but egregiously so by reason of its abusive or oppressive purpose and its lack of justification by any government interest. See Lewis, 118 S. Ct. at 1716-20. Significantly, even when applying the less-exacting Shields/Piper "waiver" standard of executive culpability, the great majority of decisions have found it not met on the facts of the particular case.[7]
 
 
 35
 History and traditional practice thus inform our threshold shocksthe-conscience inquiry with little of help. They teach that the administrative error that occasioned the challenged decision here is one too frequently made in penal systems administration to raise any presumption of arbitrariness "in the constitutional sense," Lewis, 118 S. Ct. at 1716 (quotation omitted), whenever it occurs. Further, they reveal that the apparently routine executive practice when such an error has been discovered has been to incarcerate or reincarcerate, no matter what the circumstances. And finally, we learn that pre-Lewis judicial decisions addressing constitutional due process challenges to such executive decisions include none having precedential force for this court, and have mainly applied a "waiver of jurisdiction" theory that proceeds by analysis too dissimilar to that mandated by Lewis to serve as persuasive authority on application of the"shocks-theconscience" test. Here, therefore, we must simply proceed without significant guidance from history and precedent to consider whether the decision to reincarcerate Hawkins was, within the threshold culpability test as most recently explained in Lewis , "shock[ing to] the contemporary conscience." Id. at 1717 n.8.[8]
 
 
 36
 We cannot make that drastic judgment about the decision. Consider the critical circumstances that were before the Parole Commission: In 1981 Hawkins had been convicted in North Carolina state court on a drug trafficking offense. Based on previous 1972 convictions in Georgia of rape and aggravated assault with intent to commit rape and a 1976 conviction in Guilford County, North Carolina for armed robbery, he was sentenced as an habitual felon to 50 years imprisonment and to a concurrent 10-year sentence on the drug trafficking offense. See State v. Simmons, 286 S.E.2d 898, 900 (N.C. Ct. App. 1982). At the time, he had an extensive record of other arrests and convictions, some under the surname "Simmons," dating back to 1967. These included a 1967 conviction for larceny and receiving; a 1969 conviction for assault on a female; a 1978 conviction for escape from work release; a 1976 grand jury charge of second degree rape that was dismissed; and a 1975 Delaware charge of resisting arrest that was nol prossed. (See J.A. 161-62; 203-4.) In 1992, after having served eleven years of his 50-year sentence, he had been erroneously paroled under a recently enacted community service parole program, designed in part to alleviate prison overcrowding, for which he was not in fact eligible. His overall prison record at the time had been a good one, with only a few rule infractions, and during his imprisonment he had obtained a bachelors degree in business management from Shaw University under a study program. (See id. at 26, 200.)
 
 
 37
 His erroneous release in 1992 was based on a Parole Case Analyst's recommendation that cited the amount of time he had served, the prison overcrowding crisis, the fact that none of Hawkins's prison rule infractions was assaultive, the fact that he had made effort to improve his situation while in prison, and the fact that he would be placed on intensive supervision under the community service parole program. (See id. at 200.) The recommendation had, however, noted that there was "some concern" about releasing Hawkins due to his "history of sexual assaultive behavior." (Id.) That concern had been expressed for the record by a Parole/Probation officer who indicated his strong opposition to Hawkins's/Simmons's release based upon the officer's personal awareness of his criminal history and his expressed opinion that he was a "career street criminal who will continue to commit street crimes once he is out of prison." (Id. at 156.)
 
 
 38
 During the two-year period of his release, Hawkins had lived with his brother and been continuously employed as an unskilled laborer by a manufacturing company. (See id. at 22, 26.) He had worked regularly and with good job evaluations and had violated no laws during the period, but had fallen behind in some of the community service obligations and fee payments required by the program. (See id. at 20-24, 246.)
 
 
 39
 He was taken back into custody by order of the Parole Commission when in 1994 it was realized that his release had not been authorized by law. (See id. at 34.) And, after affording him a hearing with counsel at which his return to parole status was urged on legal and humanitarian grounds, (see id. at 29-30, 120-21), the Commission had formally revoked his parole and ordered his reincarceration. (See id. at 32, 34.)
 
 
 40
 To declare the Parole Commission's decision so "egregious and outrageous" as to "shock the contemporary conscience" under these circumstances, we would have to believe that it was infected or driven by something much worse--more blameworthy--than mere negligence, or lack of proper compassion, or sense of fairness, or than might invoke common law principles of estoppel or fair criminal procedure to hold the state to its error. To keep things in constitutional proportion, we would have to see in it a mindless"abus[e of] power," or a deliberate exercise of power "as an instrument of oppression," Collins, 503 U.S. at 126 (quotation omitted), or power exercised "without any reasonable justification in the service of a legitimate governmental objective." Lewis, 118 S. Ct. at 1716.
 
 
 41
 We do not believe the Parole Commission's decision can be declared one meeting that stringent threshold constitutional test. Nothing about it suggests any element of vindictiveness or of power exercised simply to oppress. There were legitimate governmental interests and objectives a-plenty to justify the act. It rectified an error in administering applicable state parole law, thereby furthering the state's fundamental interest in correct application of its laws. In doing so it avoided the precedential risk of acquiescing in irregular enforcement of state law. It reincarcerated under more secure custody a recognized high-risk prisoner erroneously released under a program driven largely by exigencies of prison crowding unrelated to the public interest in security against the specific risk he posed. And in compliance with state law, it properly credited Hawkins with the time spent on erroneous release. See N.C. Gen. Stat. § 15A-1373(d)(1) (so requiring where parole revoked).
 
 
 42
 While the Commission's earlier conduct leading up to and including erroneous release on parole was bungling at every step, it could not be characterized as anything but simple negligence. And, more critically, it had nothing to do with revocation of the parole that was actually granted far in advance of the parole release dates about which Hawkins had been negligently misinformed. It therefore has no real bearing upon the question whether the later revocation of the parole erroneously granted was conscience-shocking.
 
 
 43
 Finally, the fact that Hawkins had not engaged in any criminal conduct during the period of his release under the"intensive supervision" condition of his parole, surely could not be thought to oblige the Commission to see in this a safely demonstrated rehabilitation from Hawkins's established pattern of assaultive behavior while not in full custody. Certainly a declination to do so could not be thought to demonstrate arbitrariness as opposed to reasoned judgment.
 
 
 44
 We therefore conclude that the Parole Commission's act cannot be considered one "shocking to the contemporary conscience" under the threshold test mandated by Lewis.
 
 B.
 
 45
 Assuming in the alternative that the claim is properly analyzed under the Glucksberg methodology as one somehow challenging a legislative enactment,[9] we proceed directly to consider whether the claimed violation was to one of "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." Glucksberg, 521 U.S. 720-21.
 
 1.
 
 46
 The first step in that "fundamental-rights-based" process, id. at 721 n.17, is to make a "careful description" of the asserted liberty right or interest that avoids overgeneralization in the historical inquiry. See id. at 722-23 (narrowing descriptions used by lower court and urged by claimants in defining liberty interest allegedly violated by assistedsuicide legislative ban). Hawkins's rhetorical reference to the right as being "freedom from unjust incarceration," Br. of Appellant at 10, and that of amicus, American Civil Liberties Union of North Carolina, as the "right to be free from arbitrary incarceration," (Br. of Amicus at 7), are issue-begging generalizations that cannot serve the inquiry. A properly precise description can, however, be found in the facts and legal authorities relied upon by Hawkins in support of his claim. From these, we deduce that the precise right asserted is that of a prisoner to remain free on erroneously granted parole so long as he did not contribute to or know of the error and has for an appreciable time remained on good behavior to the point that his expectations for continued freedom from incarceration have "crystallized."[10]
 
 
 47
 We do not believe that this asserted right or liberty interest can be declared a "fundamental" one that is "objectively, deeply rooted in this Nation's history and tradition." Glucksberg, 521 U.S. at 720-21. When its narrow compass and special circumstances are considered, it surely cannot be said to be so "`implicit in the concept of ordered liberty,' . . . that `neither liberty nor justice would exist if [it] were sacrificed.'" Id. at 721 (quoting Palko, 302 U.S. at 325, 326). Contrast it with the relatively few, more generally shared, un-enumerated rights that over time have been found by the Supreme Court (and not without difficulty) to have that "fundamental" quality: to marry, see Loving v. Virginia, 388 U.S. 1 (1967); to have children, see Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535 (1942); to direct one's children's upbringing, see Meyer v. Nebraska, 262 U.S. 390 (1923); to marital privacy, see Griswold v. Connecticut , 381 U.S. 479 (1965); to abortion, see Roe v. Wade, 410 U.S. 113 (1973); to personal control of one's medical treatment, see Cruzan v. Director, Mo. Dep't of Health, 497 U.S. 261 (1990); and to bodily integrity, see Rochin, 342 U.S. 165 (1952).
 
 
 48
 This conclusion is bolstered by the amorphous, heavily subjective nature of such an asserted right based as it is on notions of sufficient temporal duration, sufficiently good behavior and"crystallized" expectations. This is not the traditional stuff of substantive due process rights. See Glucksberg, 521 U.S. at 722 (emphasizing importance of fundamental rights analysis that "rein[s] in the subjective elements that are necessarily present in due process judicial review"). The claimed right here is one almost entirely composed of subjective elements. There are no objective criteria for assessing how long a period of freedom is enough; nor how exemplary the behavior on freedom must be; nor when and under what circumstances expectations have sufficiently "crystallized." At odds with the Glucksberg admonition, enforcement of such a right would therefore rest almost entirely upon the subjective judgments of judges applied to widely varying factual circumstances.
 
 
 49
 Finally, we note a point that may most clearly demonstrate that the specific liberty interest asserted here is not one of those "fundamental" interests uniquely entitled to substantive, as opposed to merely procedural, due process protection. As is evident from the interest as asserted, it could only be thought to arise from the inaction of state officials over a sufficiently long period of time. As described by the claimant, there is no suggestion that it arose immediately upon the mistaken grant of parole. And, if not then, surely not in some preexisting putative constitutional form, for no one has suggested that had the mistake been discovered and re-incarceration ordered immediately after the release, there would have been any violation of constitutional right.
 
 
 50
 As Justice Powell has pointed out, while liberty interests entitled to procedural due process protection may be created by state law as well as the Constitution itself, those entitled to substantive due process protection (whatever the procedures afforded) are "created only by the Constitution." Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 229 (1985) (Powell, J., concurring). And, if not by positive state law, surely not by conduct of state officials giving rise to some form of right-by-estoppel. Cf. Connecticut Bd. of Pardons v. Dumschat, 452 U.S. 458, 464-65 (1981) (holding that constitutionally protected liberty interest in commutation of prisoner's sentence "cannot be created--as if by estoppel"--from consistent practice of commutation by state officials in "most" cases) (quotation omitted).
 
 
 51
 Our conclusion that the liberty interest asserted by Hawkins is not a "fundamental" one means that if, as we now assume arguendo, state legislation is the effective cause of its impingement, the legislation need only be rationally based to survive judicial review. See Glucksberg, 521 U.S. at 728 (so holding). Given the obvious state interests involved in re-imprisoning any erroneously released convict, see ante at 747, legislation requiring it in this case clearly survives that level of review.
 
 2.
 
 52
 Before leaving the "fundamental right" point, we should take account of a number of judicial decisions that Hawkins contends indicate, at odds with our conclusion, that the right he asserts is a "fundamental" one. We disagree, and briefly explain our reasons.
 
 
 53
 His principal reliance is upon two decisions of this court which he contends already have recognized the right as one entitled to substantive due process protection. In United States v. Lundien, 769 F.2d 981 (4th Cir. 1985), cert. denied, 474 U.S. 1064 (1986), followed by United States v. Cook, 890 F.2d 672 (4th Cir. 1989), we considered constitutional challenges to the power of courts to increase sentences after their formal impositions. In both cases, the court posited that at some point a prisoner's expectation of the duration of his sentence as imposed would "crystallize" and thereby give rise to an enforceable due process right to its finality. In neither case, however, was the posited right found to have arisen. See Lundien, 769 F.2d at 987; Cook, 890 F.2d at 675.
 
 
 54
 Aside from the fact that in view of their specific holdings the due process assumptions made in those cases were dicta, they could not be taken even as persuasive dicta for assessing the quite different right asserted by Hawkins. In the first place, neither decision undertook the rigorous historical inquiry mandated by Glucksberg into whether the specific right they posited--that of sentence finality upon a sufficient lapse of time--was one sufficiently rooted in history and legal tradition to be considered "fundamental." And had such an inquiry been undertaken, it would have been concerned with a quite different right than that specifically asserted by Hawkins. Finally, the linchpin of that quite different right, a claimant's"crystallized expectations," which Hawkins would import as the linchpin of his asserted right, has been specifically rejected by the Supreme Court as a source of substantive due process right in related contexts. See Dumschat, 452 U.S. at 465 (holding that a felon's "expectation" of commutation or pardon because of consistent practice in comparable cases is "simply a unilateral hope" that does not give rise to a constitutionally protected liberty interest); Leis v. Flynt, 439 U.S. 438, 444 n.5 (1979) (per curiam) (rejecting position that the "implicit promise" inherent in a state's "past practice" of granting pro hac vice status to non-resident lawyers could give rise to a constitutionally protected liberty interest in that status).
 
 
 55
 Next, Hawkins relies on the several decisions that have applied the Shields v. Beto "waiver-of-jurisdiction" theory to find due process violations in the re-imprisonment of erroneously released prisoners.[11] With all respect to those few courts, we do not believe that theory is now a viable one for finding substantive due process violations in this circumstance.
 
 
 56
 First off, as applied by the courts, it makes no effort, as Glucksberg instructs is required, to find in history and legal tradition any recognition of the liberty interest asserted here as a fundamental one. Instead, it focuses entirely on the conduct of state officials in failing over time to re-imprison, thereby prolonging unduly an erroneously granted freedom. In finding a substantive due process violation on that basis, it either assumes that substantive due process protects against any sufficiently arbitrary act of government, without regard to the existence of any affected liberty interest, or that a constitutionally protected liberty interest can be created simply by the expectation-inducing conduct of state officials. Neither assumption is valid under contemporary substantive due process jurisprudence.
 
 
 57
 There is no general liberty interest in being free of even the most arbitrary and capricious government action; the substantive component of the due process clause only protects from arbitrary government action that infringes a specific liberty interest. See Ewing, 474 U.S. at 226 (observing that courts may not invalidate legislation merely because it is thought arbitrary or unreasonable); Nunez v. City of Los Angeles, 147 F.3d 867, 873 (9th Cir. 1998) ("There is no general liberty interest in being free from capricious government action."); Dobrovolny v. Moore, 126 F.3d 1111, 1113 (8th Cir. 1997) ("[W]here no [protected life, liberty or property] interest exists, there can be no due process violation."), cert. denied, 118 S. Ct. 1188 (1998).
 
 
 58
 Nor, as earlier discussed, can liberty interests protected by the substantive component of the due process clause be found except in the Constitution itself; they cannot be created by state law nor, perforce, simply by the relianceor expectation-inducing conduct of state officials. See Ewing, 474 U.S. at 229 (Powell, J., concurring).
 
 
 59
 With respect, we therefore believe the waiver-of-jurisdiction theory runs afoul of both these limiting principles of contemporary substantive due process law. Accordingly, we can find no support for Hawkins's claim in decisions applying it.
 
 
 60
 Finally, Hawkins relies on DeWitt v. Ventetoulo, 6 F.3d 32 (1st Cir. 1993), in which the court found due process (whether substantive or procedural is not clear) violated by the re-imprisonment of a state parolee following the restoration of an original sentence whose erroneous reduction had resulted in a premature grant of parole. The court treated the claim as essentially one challenging on due process grounds the effective increase (by restoration) of the previously reduced sentence. Relying in part on our decisions in Lundien and Cook which had posited constitutional limits, defined by the "crystallization" of a prisoner's induced expectations, on the judicial power to increase sentences, the court found that constitutional right violated. Without attempting to identify or locate the specific liberty interest being asserted in history and tradition, the court based its conclusion on, inter alia, the state's untoward delay in revoking parole, the parolee's lack of complicity in the underlying administrative error, and the reasonable expectations of continued freedom that had resulted. See id. at 35-36. For the same reasons we find Lundien and Cook inapposite to issues presented by Hawkins's quite different claim, we find DeWitt similarly unpersuasive under current substantive due process law.
 
 
 61
 * * * *
 
 
 62
 We have concluded that under current Supreme Court substantive due process doctrine, no violation of constitutional right can be found in this case. Specifically, we hold that the precise liberty interest asserted here--that of continuing in a state of freedom erroneously granted by government and enjoyed for a significant time by a convict who yet remains under an unexpired lawful sentence--cannot be found one of "those fundamental rights and liberties which are objectively `deeply rooted in this Nation's history and tradition.'" See Glucksberg, 521 U.S. at 720-21 (quoting Moore 431 U.S. at 503). Nor, unless possibly when solely animated by a vindictive or oppressive purpose that is not suggested here, could the executive act of reimprisoning under such circumstances be declared"shock[ing to] the contemporary conscience." See Lewis, 118 S. Ct. at 1717 n.8.
 
 
 63
 If recourse from this regrettably frequent occurrence in penal system administration is to be had by state convicts, it must be found, as frequently it has been, by courts applying state common law and equitable principles, or by executive clemency.[12]
 
 AFFIRMED
 
 
 Notes:
 
 
 *
 Judge Ervin heard oral argument but died before the en banc decision was filed.
 
 
 [1]
 This is the position taken in Justice Souter's opinion for the Court in Lewis, in which he was joined by Chief Justice Rehnquist and Justices O'Connor, Kennedy, Ginsburg and Breyer. Lewis thus clearly holds both that the "shocks-the-conscience" test has continued vitality in actions challenging executive acts on substantive due process grounds and that in those it should be applied as a threshold test. What is not perfectly clear, however, is the extent to which this threshold test is to be applied independently of any consideration of what relevant history, tradition and precedent may have to say about the asserted right and its protection. Justice Souter's opinion for the Court seems in the main to posit a completely independent threshold inquiry that focuses solely on the actor's culpability, and would turn to history, tradition and precedent only after the conduct had been found conscience-shocking, and then only to determine whether history, tradition and precedent demonstrated that the right asserted was one entitled to substantive due process protection. See Lewis, 118 S. Ct. at 1717 n.8. Responding, however, to Justice Scalia's objection to any continued use of a shocks-the-conscience test rather than relying solely on precedent and historical protections to assess all substantive due process claims, Justice Souter allowed that whether particular conduct was conscience-shocking "may be informed by a history of liberty protection, but would necessarily reflect[ ] an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them." Id.
 Further on the point, Justice Kennedy, specially concurring and joined by Justice O'Connor, after expressing general skepticism about the "shocks-the-conscience" test, indicated that he thought it could not serve as a wholly independent test but only as the beginning point in a process that must take into account history, tradition and precedent in assessing the "objective character" of the challenged act. Id. at 1722 (Kennedy, J. concurring). Though Justice Souter's opinion seemed not to require this, Justice Kennedy thought that the reasons given for its "not-shocking" conclusion indicated that history, tradition and precedent had been sufficiently taken into account to meet his concern. Id.
 From all this, we assume that courts seeking faithfully to apply the Lewis methodology in executive act cases properly may look to history for whatever it may reveal about traditional executive practices and judicial responses in comparable situations by way of establishing context for assessing the conduct at issue.
 
 
 [2]
 Of particular importance to an understanding of the Glucksberg Court's prescribed methodology is the Court's deliberate rejection of an alternative approach urged by Justice Souter in a special concurrence. See Glucksberg, 521 U.S. at 752-89 (Souter, J., concurring in the judgment). In its most critical differentiating feature, Justice Souter's approach would not confine the special protection of"strict scrutiny" due-process review to just those un-enumerated liberty interests that at some time in the nation's history, legal tradition and practice had come to be considered "fundamental." Believing that such a limiting threshold historical inquiry confined substantive due process review too rigidly to "past practice described at a very specific level," id. at 765, Justice Souter's alternative would avoid it and take a more flexible approach rooted essentially in the understanding of substantive due process review expressed in Justice Harlan's dissent in Poe v. Ullman, 367 U.S. 497, 542-55 (1961) (Harlan, J., dissenting). Under that approach, courts might identify those special liberty interests uniquely entitled to "strict scrutiny" protection by a more open-ended analysis that, though informed by history and legal tradition, was not narrowly defined by specific past practices they might reveal. So, for example, they might take into account evidence of changing traditions, see Glucksberg, 521 U.S. at 775-77 (Souter, J., concurring) (noting relevance to claim of assisted suicide right of state's decriminalization of suicide itself), and judicial and legislative recognition of different, though related, interests entitled to protection against state-action. See id. at 778-80 (Souter, J., concurring) (noting relevance to claim of assisted-suicide right of judicial and legislative recognition of rights to terminate life support and to assisted abortion as related forms of protected right to"bodily integrity"). Asserting that this alternative approach "would largely abandon [the] restrained methodology" that it considered to be"established" in its substantive due process jurisprudence, the Court expressly rejected it. Id. at 721-22. In the Court's view, the alternative had no legal standing in the Court's substantive due process jurisprudence as a parallel or displacing methodology to the Court's "fundamental-rights-based analytical method." Id. at 721 n.17. And, it could not, as could the prescribed method, adequately "rein in the subjective elements that are necessarily present in due-process judicial review," nor"avoid[ ] the need for complex balancing of competing interests in every case." Id. at 722. The special importance for our purposes of the Glucksberg Court's express reaffirmation of its "fundamental-rights-based analytical method" and rejection of a powerfully argued contemporary-interests balancing alternative, will appear in our analysis of the claim before us.
 
 
 [3]
 Broadly speaking, the cases collected involve one or the other of the following factual scenarios. In "delayed incarceration cases," the relevant governmental authority fails timely to take the convicted criminal into custody. See, e.g., United States v. Martinez, 837 F.2d 861 (9th Cir. 1988) (seven and one-half-year delay in prisoner's incarceration). In "detainer cases," a prisoner is either released from the custody of one jurisdiction notwithstanding the fact that a valid detainer has been lodged by a second jurisdiction, see, e.g., Farley v. Nelson, 469 F. Supp. 796 (D. Conn.) (defendant paroled by Maryland penitentiary and not taken into federal custody notwithstanding fact that two federal detainers were on file with the Maryland authorities), aff'd, 607 F.2d 995 (2d Cir. 1979), or is released by one jurisdiction because a second jurisdiction to which he owes time has failed to file a detainer. See , e.g., Shelton v. Ciccone, 578 F.2d 1241 (8th Cir. 1978) (defendant released from state custody when a federal detainer should have been but was not lodged with state authorities). Finally, there are "early release cases" where, as in the case at hand, by some administrative error, a prisoner is prematurely released or paroled. See, e.g., Johnson v. Williford, 682 F.2d 868 (9th Cir. 1982) (prisoner who was convicted and sentenced under a federal statute requiring a 10-year minimum sentence without possibility of parole was erroneously paroled). Although these categories account for the great bulk of the cases, not all of the cases fit neatly into them. See, e.g., Ex Parte Bugg, 145 S.W. 831 (Mo. Ct. App. 1912) (prisoner intentionally released from custody on a suspended sentence because of fear that he was contracting tuberculosis and to allow him to"seek a change of climate").
 
 
 [4]
 This is inferred from the fact that all of the cases collected in the Chin article and all others cited to us and noted in this opinion involve prisoner challenges to administrative decisions to incarcerate upon discovery of error. No decision of which we are aware involves a challenge by government to an administrative decision not to incarcerate. While there obviously is less incentive for government than prisoners to challenge unfavorable decisions in this situation, government challenges must generally be possible. See, e.g., In re Hawley, 484 A. 2d 684 (N.J. 1984) (holding that prosecutor has right and duty to appeal a decision of State Parole Board); Mich. Comp. Laws Ann. § 791.234(7) ("The action of the parole board . . . is appealable by . . . the prosecutor . . . ."). A complete absence of government challenges would seem therefore more likely to reflect an absence of unfavorable decisions than disinclination or inability to make a challenge.
 
 
 [5]
 Many of the challenges have been made and decided on non-constitutional common law grounds of governmental"estoppel," see, e.g., Johnson, 682 F.2d 868 (alternative ground); or "improper installment sentence." See, e.g., White v. Pearlman, 42 F.2d 788 (10th Cir. 1930). Decisions on those grounds have no relevance to issues of constitution-level executive arbitrariness. See Lewis, 118 S. Ct. at 171718 (noting critical difference between minimum constitutional and non-constitutional culpability levels); see also Dunne v. Keohane, 14 F.3d 335, 336-37 (7th Cir. 1994) (Posner, C.J.) (noting that common law rule prohibiting government from "delay[ing] the expiration of [a] sentence either by postponing [its] commencement . . . or by releasing the prisoner for a time and then reimprisoning him" is not a"constitutional command"). We therefore look only to decisions on constitutionally grounded claims.
 
 
 [6]
 Finding common law antecedents of this theory (and a related one of "implied pardon") in a few federal and state cases, Shields adopted it as a constitutional rule in a habeas case in which a state had incarcerated a prisoner 28 years after it had released him in mid-sentence to another state and 18 years after the latter state had paroled him in the absence of any detainer filing by the incarcerating state. See Shields, 370 F.2d at 1003-04.
 
 
 [7]
 See Camper v. Norris, 36 F.3d 782 (8th Cir. 1994); Martinez, 837 F.2d 861; Mobley v. Dugger, 823 F.2d 1495 (11th Cir. 1987); Green v. Christiansen, 732 F.2d 1397 (9th Cir. 1984); Mathes v. Pierpont, 725 F.2d 77 (8th Cir. 1984); Piper, 485 F.2d 245; Patterson v. O'Dea, 1996 WL 554564 (6th Cir. Sept. 27, 1996) (unpublished); Hallums v. Hambrick, 1994 WL 279394 (6th Cir. June 21, 1994) (unpublished); Mistretta v. Whalen, 1993 WL 118074 (7th Cir. April 14, 1993) (unpublished); Christian v. Smith, 1991 WL 85227 (6th Cir. May 20, 1991) (unpublished); Sterling v. Maggio, 505 F. Supp. 1111 (M.D. La. 1981); Farley, 469 F. Supp. 796; Bailey v. Ciccone, 420 F. Supp. 344 (W.D. Mo. 1976); Esquivel v. Estelle, 426 F. Supp. 619 (W.D. Tex. 1976), aff'd, 547 F.2d 309 (5th Cir. 1977); Clifton v. Beto, 298 F. Supp. 1384 (S.D. Tex. 1968), aff'd on other grounds, 411 F.2d 1226 (5th Cir. 1969); United States v. Vann, 207 F. Supp. 108 (E.D.N.Y. 1962); United States v. Brandt, 1987 WL 16235 (N.D. Ill. Aug. 26, 1987) (unpublished). But see Shields, 370 F.2d 1003 (finding for prisoner on the facts); Johnson,
 682 F.2d 868 (same) (alternative ground); Lanier v. Williams, 361 F. Supp. 944 (E.D.N.C. 1973) (same); Shelton , 578 F.2d 1241; (granting prisoner evidentiary hearing on issue of waiver); see also United States v. Merritt, 478 F. Supp. 804 (D.D.C. 1979) (applying Piper standard to require release of prisoner where time spent on erroneous release would, if credited, have caused sentence to expire).
 
 
 [8]
 Amicus American Civil Liberties Union of North Carolina, attempting to avoid the rigor of Lewis's exposition of the shocks-the-conscience test, suggests that it should not apply to habeas claims but only to substantive due process claims of "constitutional tort" brought, e.g., under 42 U.S.C. § 1983. (See Amicus Br. of Amicus at 21-25.) No authority is advanced for the proposition beyond the fact that Lewis and the Supreme Court cases applying the test upon which it expressly relies all involve "constitutional tort" claims seeking damages or injunctive remedies against government officials. We know of no authority suggesting that, except in the matter of remedy, the elements of a substantive due process (or other constitutional) claim differ depending upon whether it is brought as a habeas or "constitutional tort" claim. Such understandably meager authority as touches the matter (as well as general principles) suggest to the contrary that the substantive elements of a claim of constitutional
 violation are the same whatever the remedy sought for the violation. See, e.g., Hamlin v. Warren, 664 F.2d 29, 30 (4th Cir. 1981) (elements of constitutional violation claim assumed to be identical for collateral estoppel purposes in successive § 1983 and habeas actions).
 
 
 [9]
 We say "somehow" because of the great difficulty earlier noted of identifying any specific state legislation that could be considered the effective cause of the challenged state action. Though the assumption that this is a "legislative-enactment" claim therefore presents great conceptual difficulty, we make it for the prudential reasons noted. And, with awareness that the "fundamental right" historical inquiry that Glucksberg mandates for such claims as a first step, see Glucksberg, 521 U.S. at 722, could also be dispositive of an executive-act claim under the Lewis analysis. See Lewis, 118 S. Ct. at 1717 n.8 (noting that if conscienceshocking executive conduct were found, the question of a protectible substantive due process interest would remain for resolution under the Glucksberg analysis).
 
 
 [10]
 This reflects the factual basis of Hawkins's claim. The extended period of release, good behavior, ignorance of official error, and "crystallized expectations" factors are based upon case law upon which he relies, and which we later discuss in text.
 
 
 [11]
 See Johnson, 682 F.2d 868 (alternative ground); Shelton, 578 F.2d 1241 (applying theory to remand for evidentiary hearing on waiver issue); Shields, 370 F.2d 1003; Merritt, 478 F. Supp. 804; Lanier, 361 F. Supp. 944.
 
 
 [12]
 A recent example of clemency is reported in Woman Whom Law Forgot Is Set Free, News & Observer, Jan. 19, 1998, at A5. As there reported, after being convicted of manslaughter in Florida in 1981, when she was forty-one years old, Loretta Randley was sentenced to eight years in prison. As a result of continuing administrative oversight, she was allowed to remain free for the following 16 years. Imprisoned in 1997 when the error was discovered, she was soon after granted a reduction of four years on her eight-year term by a state trial judge who, applying general equitable principles, found full commutation not warranted despite Randley's apparently exemplary behavior during her sixteen years of unauthorized freedom. While review of the court's reduction of sentence was pending, Randley sought executive clemency which was granted by the state clemency board in the form of commutation of her sentence to time served.
 MURNAGHAN, Circuit Judge, dissenting:
 Because I believe that the Constitution protects the right of a person to be secure in his liberty after twenty months of freedom during which his expectations of continued freedom rightfully crystallized, I respectfully dissent from the majority.
 I.
 On February 27, 1981, Irving Hawkins was convicted in Guilford County, North Carolina, of the possession, sale, and delivery of cocaine. Because he qualified as a habitual felon, he was sentenced to fifty years in prison. He also received a concurrent ten-year sentence for possession of cocaine.
 Hawkins received conflicting messages concerning his parole date throughout his time in prison. Sometime within his first year and a half of incarceration, the Parole Commission informed Hawkins that he would be eligible for parole very shortly after his conviction. On June 14, 1982, the Commission informed Hawkins that it had been mistaken; he would be ineligible for parole until October 20, 2010. The Commission told Hawkins at the time that "we have studied all the facts in your case and we are sure that we are following the requirements of the law . . . ." The following year, the Commission changed its mind once again. The Commission informed Hawkins that "[a]fter carefully checking your parole eligibility date, we find that you will not be eligible for parole until April 20, 2018."
 In March of 1992, Hawkins received a letter from the Commission advising him that the Commission was considering him for early parole under the Community Service Parole statute.[1] North Carolina passed the Community Service Parole statute, in part, to alleviate a prison overcrowding crisis in the North Carolina penal system.
 Hawkins, in fact, was not eligible for early parole under the statute because North Carolina law had changed shortly after Hawkins was convicted. At the time of Hawkins' conviction, North Carolina law provided that a "habitual felon" who was convicted of a felony had to serve at least 75% of his or her sentence before becoming eligible for parole. See N.C. Gen. Stat. § 14-7.6 (repealed 1981). A few months after Hawkins' conviction and sentencing, however, the law was repealed and replaced with a law that required habitual felons convicted of felonies to serve at least seven years before becoming parole eligible. Because the new law only operated prospectively, Hawkins was not entitled to the benefit of the more lenient parole system for which he would have been qualified, having served eleven years. In any event, it is likely that when Hawkins received his letter from the Commission in 1992, he had seen felons with criminal histories, sentences, and offenses identical to his own (though committed after July 1981), released on parole after having served seven years of their sentences.
 When the Commission contacted Hawkins in March of 1992, it was no longer confused as to what date he was legally eligible for parole. A memo from the case analyst to the unit supervisor stated clearly that Hawkins' parole eligibility date was April 20, 2018. The Commission nevertheless decided to act as though Hawkins qualified for the Community Service Parole program.[2]
 In order to parole Hawkins under the program, the Commission had to find that Hawkins was unlikely to engage in further criminal conduct. Hawkins thus went through a fairly detailed procedural review. In the four months between March 13, 1992 and July 6, 1992, Hawkins was required to submit home and job plans to the Commission for approval. The Parole Case Analyst assigned to Hawkins conducted an investigation with the help of a field worker. Those individuals interviewed Hawkins and law enforcement officials familiar with him. Based on this information, the Case Analyst made a recommendation of parole to the full Commission. The full Commission then approved it. That lengthy and involved procedure, involving the participation and review of numerous individuals in the law enforcement community, could only have added to Hawkins' belief that he truly was eligible for parole.
 Confirming Hawkins' belief in a way that must have been immeasurably powerful to his psyche, Hawkins was actually released from prison on July 6, 1992. Out in the community, Hawkins began the process of rebuilding his life. He reunited with his family and friends. He moved in with his brother, paying half of the monthly expenses. He obtained a job. He aided with the care of his mother. He tried to reestablish ties with his children. He got engaged. All the while, Hawkins substantially complied with his parole obligations.
 After twenty months of settling into the routines of a life without incarceration, Hawkins was abruptly arrested. Hawkins was not arrested because he had violated his parole, nor had the Commission learned of a reason to change its assessment that Hawkins was not a threat (in fact, twenty months of evidence supported the Commission's assessment). Instead, the Commission reincarcerated Hawkins because, as it turned out, he had been ineligible for parole under the community service program by a few months.[3]
 Hawkins had been paroled through no fault or connivance of his own. Though this parole was erroneously granted, Hawkins had no reason to know of that error. Once paroled, the only record evidence is that for twenty months while on parole he handled himself as a model citizen. He committed no crimes and substantially complied with his parole obligations. During that time, Hawkins, who had behaved well during his prison term, on parole adjusted to and settled into his liberty. He had every right to expect, and did indeed expect, that he would retain that liberty so long as he complied with his parole obligations. The State returned Hawkins to jail, not because of any new wrongdoing, but to enforce the letter of a law that the State had repealed almost two decades ago.
 II.
 The Due Process Clause of the Fourteenth Amendment guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. Although a literal reading of the Clause may suggest that the government only has to afford its citizens a fair process, the Clause has been understood to contain a substantive component as well, "barring certain government actions regardless of the fairness of the procedures used to implement them." County of Sacramento v. Lewis, 118 S. Ct. 1708, 1713 (1998) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).
 The Due Process Clause expands the scope of individual liberty beyond the rights guaranteed in the first eight amendments to the Constitution. The Supreme Court has recognized a special group of rights that deserve protection under the Due Process Clause, despite not being explicitly mentioned in the Bill of Rights. The Court has "regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, `deeply rooted in this Nation's history and tradition,' and`implicit in the concept of ordered liberty,' such that `neither liberty nor justice would exist if they were sacrificed.'" Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) (quoting Moore v. City of East Cleveland, 431 U.S. 494, 503 (1977) (plurality opinion), Palko v. Connecticut, 302 U.S. 319, 325 (1937), and id. at 326) (emphasis added) (citations omitted).
 Courts are often called on to exercise their reasoned judgment to protect fundamental personal liberties from the overreaching of the State. See Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 849 (1992). As Justice Harlan aptly noted:
 Due Process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of the organized society.
 Poe v. Ullman, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting from dismissal on jurisdictional grounds), quoted in Casey, 505 U.S. at 849-50 (1992). It is also true, however, that the Supreme Court has been "reluctant to expand the concept of substantive due process." Glucksberg, 521 U.S. at 720 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992)). Nevertheless, "[i]t is a promise of the Constitution that there is a realm of personal liberty which the government may not enter. We have vindicated this principle before. Marriage is mentioned nowhere in the Bill of Rights and interracial marriage was illegal in most states in the 19th century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in Loving v. Virginia." Casey, 505 U.S. at 847-48 (citation omitted).
 In the case at bar, we are asked whether the State's reincarceration of a rehabilitated parolee after twenty months of successful reintegration into society violates the Due Process Clause of the Fourteenth Amendment. The majority believes that the State can, consistent with the Due Process Clause, reincarcerate a parolee it released erroneously regardless of the amount of time the parolee has lived as a free man. I respectfully disagree. The framework for analyzing Hawkins' due process claim depends on whether the State's alleged violation was by executive act or by legislative enactment. The Supreme Court's "shocks the conscience" test, recently reaffirmed in Lewis, only applies to cases of executive action. See Lewis, 118 S. Ct. at 1716-17. Although I analyzed Hawkins' claim initially as if it involved executive action, I am now persuaded that Lewis does not apply to the case at bar.
 Lewis involved a substantive due process challenge to a death caused by a reckless police chase of a speeding motorcycle. See id. at 1712-13. It thus was a classic example of executive action--an individual police officer making an on the spot discretionary judgment as to the appropriate way to enforce a law. Here, however, it was evident by the State's admissions during oral argument that, although the Parole Commission formally was the actor responsible for reincarcerating Hawkins, the Commission's decision was required by a non-discretionary, systemic policy. Challenges to systemic policies are unlike challenges to police chases. The legislative-executive distinction announced by the Court in Lewis is justified by the underlying principle that "substantive due process is most apt when marshaled to protect individual rights against systematic governmental invasion. [Because] [l]egislation reflects the institutional judgment of an entire branch of the government, while some forms of executive action can be undertaken by a single actor . . . it was reasonable for the Court to impose a different standard" on the former than on the latter. The Supreme Court, 1997 Term--Leading Cases, 112 HARV. L. REV. 192, 198 (1998). The use of the"shocks the conscience" inquiry therefore is not necessarily appropriate in cases such as this one involving the non-discretionary application of a legislative policy.
 III.
 A.
 The substantive due process framework for analyzing Hawkins' claim is that detailed in Washington v. Glucksberg, 521 U.S. 702 (1997). Substantive due process acts to protect those "fundamental rights and liberties which are, objectively, `deeply rooted in this Nation's history and tradition,' and `implicit in the concept of ordered liberty,' such that `neither liberty nor justice would exist if they were sacrificed.'" Id. at 720-21 (quoting Moore v. City of East Cleveland, 431 U.S. 494, 503 (1977) (plurality opinion), Palko v. Connecticut, 302 U.S. 319, 325 (1937), and id. at 326) (citations omitted). The Supreme Court has counseled that "[o]ur Nation's history, legal traditions, and practices thus provide the crucial `guideposts for responsible decisionmaking,' that direct and restrain our exposition of the Due Process Clause." Id. at 721 (quoting Collins, 503 U.S. at 125). The government may not infringe upon a fundamental right unless the infringement is narrowly tailored to serve a compelling state interest.[4] See id.
 The Supreme Court has advised us to be reluctant in breaking new ground in recognizing fundamental rights. Hawkins has not asked us to break any new ground. A number of cases, including two decisions from the Fourth Circuit, have already recognized that Hawkins' liberty interest is fundamental. These cases have held that it is fundamentally unfair and violates the guarantee of due process for a court to increase a sentence, even when correcting an unlawful sentence, once the defendant has served so much of his original sentence that "his expectations as to its finality have crystallized." See, e.g., United States v. Lundien, 769 F.2d 981, 987 (4th Cir. 1985); United States v. Cook, 890 F.2d 672, 675 (4th Cir. 1989).
 In Lundien, the district court sentenced the defendant to two concurrent ten-year prison terms. Five days later, however, the court increased the defendant's sentence to twenty years in prison. See Lundien, 769 F.2d at 982. The defendant challenged his amended sentence, and the Fourth Circuit ruled on the constitutionality of the district court's actions. The court held that the Double Jeopardy Clause did not address the defendant's situation. Instead, the court stated that "[i]t seems more likely that any constitutional source for protection of the defendant's interest in the finality of his sentence must be found in the fifth amendment's guarantee of due process." Id. at 986.
 The court recognized that the Due Process Clause places some outer limits on the State's ability to alter a defendant's sentence. The court outlined the following principle that applies to the case at bar:
 [D]ue process may also be denied when a sentence is enhanced after the defendant has served so much of his sentence that his expectations as to its finality have crystallized and it would be fundamentally unfair to defeat them. As the First Circuit has stated the principle:
 [T]he power of a sentencing court to correct even a statutorily invalid sentence must be subject to some temporal limit. When a prisoner first commences to serve his sentence, especially if it involves a long prison term as here, the prospect of release on parole or otherwise may seem but a dimly perceived, largely unreal hope. As the months and years pass, however, the date of that prospect must assume a real and psychologically critical importance. The prisoner may be aided in enduring his confinement and coping with the prison regime by the knowledge that with good behavior release on parole or release outright will be achieved on a date certain. After a substantial period of time, therefore, it might be fundamen tally unfair, and thus violative of due process for a court to alter even an illegal sentence in a way which frustrates a prisoner's expectations by post poning his parole eligibility or release date far beyond that originally set.
 Id. at 987 (quoting Breest v. Helgemore , 579 F.2d 95, 101 (1st Cir. 1978) (emphasis added) (second alteration in original). After conducting the due process analysis, however, the court held for the government on the facts because the defendant had served only five days of his ten-year sentence. His expectations as to the finality of the sentence therefore had not crystallized. See id.
 The Fourth Circuit reaffirmed the principle announced in Lundien in United States v. Cook, 890 F.2d 672 (4th Cir. 1989). In Cook, the court recognized that a court's inherent power to correct a mistaken sentence was not absolute. In doing so, it explained:
 This inherent power is not without limitation, for at some point every sentence must become final. As we indicated in United States v. Lundien, it would be fundamentally unfair and a violation of due process to allow a district court to enhance a sentence "after the defendant has served so much of his sentence that his expectations as to its finality have crystallized."
 Id. at 675 (quoting Lundien, 769 F.2d at 987) (part of citation omitted). The court therefore held that the district court's power to correct even "an acknowledged and obvious mistake" in sentencing "exists only during that period of time in which either party may file a notice of appeal. After that time, we believe that the sentence has become final, and the district court lacks any authority to modify it." Id.
 The First Circuit followed our decisions in Lundien and Cook and held for a parolee on due process grounds in Dewitt v. Ventetoulo, 6 F.3d 32 (1st Cir. 1993). Dewitt had been sentenced to life imprisonment after being convicted of assault with intent to murder. See id. at 33. While in prison, Dewitt aided a prison guard who was attacked by an inmate and later testified for the state in the prosecution of the inmate. In recognition of these efforts, the trial court suspended all but fifteen years of the defendant's life sentence. See id.
 Two years later, the state supreme court held in a separate case that a trial court could not suspend a sentence once a defendant had begun to serve it. See id. Nevertheless, the State made no effort to undo the suspension of the defendant's sentence. Six years after the State partially suspended his sentence, the State granted the defendant parole and released him from prison. The defendant would not have been eligible for parole for another sixteen months had the State not suspended his sentence. See id.
 After his parole, Dewitt started a painting business and then a siding business. Dewitt also was able to reestablish relationships with his family members and his girlfriend. See id. Eight months after his release, however, he was involved in an altercation for which he was arrested. Instead of seeking to revoke his parole, the State vacated its earlier order suspending Dewitt's life sentence. Dewitt was recommitted to serve the remainder of his term of life imprisonment. See id.
 Reserving the question whether Dewitt had violated the conditions of his parole, the First Circuit addressed Dewitt's argument that his reincarceration violated the Due Process Clause. The court held that due process fundamental fairness prohibited the State from reimposing Dewitt's original life term. Citing Lundien , the court stated that:
 A convicted defendant does not automatically acquire a vested interest in a mistakenly low sentence. Only in the extreme case can a court properly say that the later upward revision of a sentence, made to correct an earlier mistake, is so unfair that it must be deemed inconsistent with fundamental notions of fairness embodied in the Due Process Clause.
 Id. at 35. The court then held that Dewitt's reincarceration was an "extreme case" that violated his due process rights. The State with due diligence could have challenged the suspension of Dewitt's sentence far earlier than it did. Further:
 Dewitt not only continued for a number of years in prison reasonably believing that his sentence had been reduced, but he was actually released. He remained free from January 1987 to September 1987 and laid down new roots in society, acquiring a job and reestablishing family ties. Only at this point, did the superior court correct its original mistake and reimprison him. The lengthy delay and change of circumstances are not decisive but they contribute to the judgment whether due process was afforded by the belated reopening.
 Id.
 A number of other courts, both at the federal and state level, have recognized the due process right set out in Lundien, Cook, and Dewitt. See, e.g., United States v. Watkins , 147 F.3d 1294, 1298 n.5 (11th Cir. 1998) ("We are mindful that a defendant's due process rights may be violated `when a sentence is enhanced after the defendant has served so much of his sentence that his expectations as to its finality have crystallized and it would be fundamentally unfair to defeat them.'") (quoting Lundien, 769 F.2d at 987); United States v. Tolson, 935 F. Supp. 17, 21 (D.D.C. 1996) ("[T]he Due Process Clause prohibits enhancing a defendant's sentence after he has served so much of it that his expectations have crystallized."); United States v. Davis, 112 F.3d 118, 123 (3d Cir. 1997); United States v. Campbell, 985 F. Supp. 158, 160-61 (D.D.C. 1997), aff'd, 172 F.3d 921 (4th Cir. 1998); Thayer v. United States, 937 F. Supp. 662, 667 (E.D. Mich. 1996); Santiago v. United States, 954 F. Supp. 1201, 1203 (N.D. Ohio 1996); United States v. Crowder, 947 F. Supp. 1183, 1193 (E.D. Tenn. 1996); Merritt v. United States, 930 F. Supp. 1109, 1115 (E.D.N.C. 1996); State v. Humes, 581 N.W.2d 317, 321 & n.22 (Minn. 1998); Austin v. State, 663 A.2d 62, 64-65 (Me. 1995); Nelson v. Commonwealth, 407 S.E.2d 326, 329 (Va. App. 1991). Most of these courts have held for the government on the facts. None of these courts, however, has questioned the legitimacy of the due process principle set out in our prior decisions.
 Fourth Circuit law provides that after an inmate is released on parole, his reasonable expectation of continued freedom crystallizes over time. Once crystallized, that reasonable expectation of freedom is a legitimate liberty interest protected by the Due Process Clause. The First Circuit in Dewitt followed the statement in Lundien that "due process must in principle impose an outer limit on the ability to correct a sentence after the event." Dewitt , 6 F.3d at 36. We should do the same and I, therefore, would continue to adhere to the principles of due process outlined in Lundien and Cook in analyzing whether Hawkins is entitled to relief.
 Hawkins was released after his eleven years of good behavior in prison led the State to erroneously believe he should receive community service parole. Hawkins had no reason to know that his release on community service parole was erroneous, especially given the release of similarly situated prisoners who were able to take advantage of the more lenient parole law passed months after Hawkins' conviction. For twenty months, Hawkins stayed out of trouble and substantially complied with his parole obligations. He obtained a college degree. Hawkins, thereafter, rebuilt his life as a free man, and it appeared that his prison days were behind him. Hawkins reestablished family ties, obtained a job, and reunited with a sweetheart.
 Hawkins' case is thus indistinguishable from Dewitt. Both Hawkins and Dewitt rebuilt their lives during substantial terms of mistaken release before the State attempted to correct its misjudgments and they were reincarcerated. The First Circuit held that, under those facts, Dewitt had an expectation of continued freedom that deserved protection under the Due Process Clause. Similarly, Hawkins' fundamental right to continued freedom crystallized over the twenty month period that he was on parole. When the state rearrested Hawkins, it infringed Hawkins' liberty interest.
 The question now becomes whether the State's violation of Hawkins' substantive due process right was narrowly tailored to serve a compelling state interest. Glucksberg, 521 U.S. at 721. The State asserts interests in deterrence, rehabilitation, and the consistent application of its laws that allegedly justify reincarcerating an erroneously released inmate to serve the remainder of his term. The State's asserted interests, however, do not survive strict scrutiny.[5]
 The State's interest in general or specific deterrence cannot survive strict scrutiny. It is not likely that any individual will be less deterred from committing a crime because he believes that, if he is caught, convicted and sentenced, the Parole Commission may erroneously parole him too early, and thereafter he will not be rearrested. The rearrest of Hawkins is not narrowly tailored to serve any compelling interest in general or specific deterrence.
 The State does not have a compelling interest in reincarcerating Hawkins for rehabilitative reasons. The State, by paroling Hawkins, found that Hawkins was unlikely to engage in further criminal conduct; twenty months of law-abiding behavior confirmed the State's assessment. The State's interest in rehabilitation therefore is weak.
 Last, the State has an interest in the consistent enforcement of its sentencing provisions. The State's interest, however, would have been better served by a competent determination of when Hawkins was eligible for parole in the first place. The Parole Commission's continually shifting yet continually confident yet inaccurate determinations were not at all well-tailored to the consistent enforcement of its sentencing provisions. The State's errors preclude it from asserting a compelling interest in reincarcerating Hawkins that would justify interference with Hawkins' fundamental right to continued freedom.
 B.
 The majority justifies ignoring the principles from Lundien, Cook, and its progeny because those cases did not "under[take] the rigorous historical inquiry mandated by Glucksberg into whether the specific right they posited--that of sentence finality upon a sufficient lapse of time--was one sufficiently rooted in history and legal tradition to be considered `fundamental.'" Maj. op. at 749. Assuming, arguendo, that the majority is correct in ignoring these decisions, I will analyze anew whether Hawkins' liberty interest qualifies as a right that is "implicit in the concept of ordered liberty."
 Hawkins' asserted liberty interest is the right to resist reincarceration and protect settled expectations of freedom.[6] In Glucksberg, the Supreme Court analyzed the specific liberty at issue in deciding whether the asserted liberty qualified as a fundamental right. The Court cited the states' longstanding bans on assisted suicide as a major reason why it would not recognize a fundamental right to assisted suicide. See Glucksberg, 521 U.S. at 723. Conversely, the case at bar does not provide such historical data, probably because the erroneous release of prisoners is largely a function of the growth of the administrative state in the late twentieth century.[7] Because the history of the specific factual situation at issue in this case is not a useful guide, we must analyze how Hawkins' asserted liberty interest is viewed in our legal tradition.
 Hawkins' liberty interest is an interest common in the law--the right to preserve settled expectations and the need for finality. For instance, the Supreme Court has held that the primary purpose of the Double Jeopardy Clause of the Constitution was "to preserve the finality of judgments." Crist v. Bretz, 437 U.S. 28, 33 (1978). The Court has also stated that the "public interest in the finality of criminal judgments is so strong that an acquitted defendant may not be retried even though `the acquittal was based upon an egregiously erroneous foundation.'" United States v. DiFrancesco, 449 U.S. 117, 129, (1980) (quoting Fong Foo v. United States, 369 U.S. 141, 143 (1962)) (per curiam). Courts therefore have held that Double Jeopardy bars resentencing when the defendant has developed a legitimate expectation of finality in his original sentence. See, e.g., United States v. Silvers, 90 F.3d 95, 101 (4th Cir. 1996).
 The Ex Post Facto Clause of the Constitution also operates to preserve settled expectations. Article I, § 10 of the Constitution provides that "[n]o State shall . . . pass any . . . ex post facto Law." Americans have the constitutional right to be secure in their expectation that their conduct, if legal when committed, will not lead to their incarceration. In the prison context, the Supreme Court has held that the retroactive removal of a prisoner's "good time credits" violates the Ex Post Facto Clause, in part, because it defeats the defendant's expectation as to the probable length of his sentence when he pleads guilty to an offense. See Lynce v. Mathis, 117 S. Ct. 891, 898 (1997); see also Hill v. Jackson, 64 F.3d 163, 167 (4th Cir. 1995) ("The purposes of the Ex Post Facto Clause are to assure that legislative acts `give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed' and to `restrict[ ] governmental power by restraining arbitrary and potentially vindictive legislation.'") (quoting Weaver v. Graham, 450 U.S. 24, 28-29 (1981)) (emphasis in original).
 Another example of the importance of finality and the need for settled expectations is the presumption against the retroactive application of new laws. The Supreme Court has held that there is a presumption that constitutional rules will not be applied retroactively to a prisoner's habeas corpus claims.[8] See Teague v. Lane, 489 U.S. 288 (1988). In Teague, the Court stated that "[a]pplication of constitutional rules not in existence at the time a conviction becomes final seriously undermines the principle of finality which is essential to the operation of our criminal justice system." Id. at 309. The court also quoted the following statement by Justice Harlan: "No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation." Id. (quoting Mackey v. United States, 401 U.S. 667, 691 (1971)) (Harlan, J., concurring in part and dissenting in part).
 Other areas of the law also focus on the need for finality and the protection of settled expectations. Statutes of limitations, the equitable doctrine of laches, waiver, and estoppel exist to cut off the State, criminal defendants, and civil litigants from defeating the expectation interests of an opposing party. The need for finality even prohibits the correction of admitted errors of constitutional dimension after time and circumstances have intervened. See, e.g., Coleman v. Thompson, 501 U.S. 722, 750 (1991) (procedural default rule under federal habeas corpus review).
 Thus, the right to preserve settled expectations and the need for finality are fundamental to our system of justice. After a certain point, even acknowledged errors must be overlooked to protect settled expectations in the interest of fairness and ordered liberty. Given these legal traditions, I would find that Hawkins had a fundamental liberty interest in his settled expectation of freedom that was infringed by the State's decision to reincarcerate him.[9]
 IV.
 I would grant Hawkins relief even should the "shocks the conscience" test apply to the case at bar. The shocks the conscience test only applies to discretionary executive actions. I thus analyze Hawkins' claim under this test as if the State made a discretionary decision to reincarcerate Hawkins after his successful reintegration into society.
 Executive action violates substantive due process"only when it `can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" Lewis, 118 S. Ct. at 1717 (quoting Collins, 503 U.S. at 128). The government's conduct must be"so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Id. at 1717 n.8.
 The Supreme Court developed the "shocks the conscience" test in Rochin v. California, 342 U.S. 165 (1952). In Rochin, the police pumped the stomach of a suspect in an effort to obtain incriminating drug evidence. The Court held that the police's conduct violated due process because "we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience." Id. at 172.
 A recent decision interpreting Lewis also provides an example of the kind of oppressive conduct that "shocks the conscience." The government's conduct satisfied the "shocks the conscience" test in Armstrong v. Squadrito, 152 F.3d 564 (7th Cir. 1998). In Armstrong, the plaintiff was a "deadbeat dad" who was behind on his child support, and, therefore, had to report to the county jail. See id. at 567. Local officials told the plaintiff that following a"brief detention" at the lockup, he would receive a court date and then be released that same day. Due to an administrative error, the plaintiff remained incarcerated for fifty-seven days. See id. at 568. The court stated that the officials' "will call policy was deficient and their practice of refusing complaints was appalling." Id. at 582. The court therefore held that "[w]hat happened to Walter Armstrong shocks the conscience." Id.
 In the case at bar, the State's conduct was sufficiently egregious so as to shock the contemporary conscience. It is important to note that it is the State's intentional decision to reincarcerate Hawkins, not his erroneous release, that shocks the conscience. However, we must consider the State's decision to reincarcerate Hawkins in light of the totality of the circumstances surrounding the State's interaction with Hawkins. The State told Hawkins initially that he could receive parole shortly after his incarceration. The State then changed its mind and told him that 2010 was Hawkins' parole date because"we are sure that we are following the requirements of the law." Finally, the State told Hawkins that it had erred once again; Hawkins' parole date was not until 2018.
 Hawkins spent eleven years in prison for his actions. The State, by paroling Hawkins, found that he was unlikely to engage in further criminal conduct. Twenty months of Hawkins' parole confirmed the State's assessment--Hawkins never committed a crime and substantially complied with the terms of his parole. In addition, Hawkins rebuilt his life; he moved in with his brother, cared for his mother, and planned to get married to an old sweetheart.
 In March of 1994, the Commission admitted that it had erred in finding that Hawkins was eligible for community service parole. The State had the option of allowing Hawkins to remain on parole or of returning him to prison, and the State chose to return him to prison.
 In sum, the State: (1) played with Hawkins' mind through everchanging parole dates; (2) found that he deserved early parole; (3) released him erroneously; (4) let him rebuild his life over twenty months of freedom; (5) admitted he substantially complied with his parole obligations; and then (6) hauled him back to prison. The State can assert no interest that even plausibly justifies re-incarcerating Hawkins except its desire to enforce a law that was repealed almost twenty years ago. Under these circumstances, the State's decision to re-incarcerate a rehabilitated man after twenty months of freedom shocks the conscience.
 V.
 I understand the majority's reluctance to rely on substantive due process to provide relief for Hawkins. Substantive due process appears to be a disfavored tool in contemporary jurisprudence. I am concerned, however, about the effects of today's decision on future parolees that are erroneously released. The majority does not argue that a twenty month release is not long enough to justify relief under the Due Process Clause. Instead, the court appears to hold that the re-incarceration of erroneously released prisoners with outstanding sentences never implicates a fundamental liberty interest, nor will it ever shock the conscience of this court.
 Consider the following hypothetical, although not implausible scenario: A parolee is not eligible for parole until 2018, but is erroneously released on parole in 1992. The State does not become aware of the error until 2012. In the meantime, the parolee rebuilds his life during a successful twenty-year reintegration into society. He obtains a job, gets married, and has children. The State, upon learning of the erroneous release, drags the parolee back to prison. Under the majority's analysis, the parolee has no fundamental right to his continued freedom, nor does his re-incarceration shock the conscience of the court. The parolee thus must return to prison for six years, leaving behind a life and family that he had built over twenty years.[10] I cannot accept that such a re-incarceration does not violate the Due Process Clause of the Constitution. Fundamental fairness requires judges to draw lines, and if we do not draw them, the State has unfettered discretion to violate the liberties of the individual. I draw the line here today--Irving Hawkins should be a free man so long as he complies with his parole requirements. I can only hope that this court will be willing to draw the line in the future, should my hypothetical scenario regretfully come to pass. Accordingly, I dissent.
 Notes:
 
 
 [1]
 It is interesting to note that Hawkins never applied for early parole.
 
 
 [2]
 The desire to eliminate the State's prison overcrowding crisis appears to have led to the bungling surrounding Hawkins' parole. Given the evidence that Hawkins was not eligible for parole until 2018, the State's bungling was worse than mere negligence.
 
 
 [3]
 It is unclear how North Carolina's prison overcrowding situation had changed, if at all, between 1992 and 1994.
 
 
 [4]
 The Glucksberg test does not consider whether the State's conduct "shocks the conscience."
 
 
 [5]
 For a more comprehensive analysis of why the State's interests do not survive strict scrutiny, see the panel opinion at 166 F.3d 267, 279-80 (4th Cir. 1999). I include only a brief description here because the majority does not contend that the State's asserted interests would survive strict scrutiny.
 
 
 [6]
 The majority defines the fundamental right at stake as "that of a prisoner to remain free on erroneously granted parole so long as he did not contribute to or know of the error and has for an appreciable time remained on good behavior to the point that his expectations for continued freedom from re-incarceration have crystallized." Maj. op. at 749. With respect, I believe that the majority's formulation of the fundamental right confuses what is needed to take advantage of the fundamental right with the right itself. The fundamental right is the right to preserve settled expectations of freedom. To take advantage of this fundamental right, a parolee must remain on good behavior while out of prison. If the parolee misbehaves, the state would have a compelling interest in re-incarceration that would trump the parolee's fundamental right. An analogy to the abortion cases might help clarify this distinction. The Supreme Court has held that a woman has a fundamental right to have an abortion. See Roe v. Wade, 410 U.S. 113, 154 (1973); Casey, 505 U.S. at 846. If the State has a compelling interest in the viability of the fetus, however, the woman cannot take advantage of her fundamental right to an abortion. See Roe, 410 U.S. at 163; Casey, 505 U.S. at 846. However, courts have never described the fundamental right to abortion as"the right of a woman who has become pregnant to terminate her pregnancy so long as the state does not have a compelling interest in maintaining the viability of the fetus." I therefore disagree with the majority's formulation of the specific right at issue, although I realize that the description of fundamental rights is an area of continual turmoil in American jurisprudence.
 
 
 [7]
 The majority cites a Law Review article outlining the history of prisoners released erroneously. See Gabriel J. Chin, Getting Out of Jail Free: Sentence Credit for Periods of Mistaken Liberty, 45 CATH U. L. REV. 403 (1996). Given that almost all of the decisions cited in the article occurred after 1930, and most occurred after 1970, these cases do not provide the kind of historical survey conducted by the Supreme Court in substantive due process cases. Further, given that many of these courts developed legal doctrines to restrict the State's decision to re-incarcerate, the article lends no support to the State's position. See , e.g., Johnson v. Williford, 682 F.2d 868, 873 (9th Cir. 1982); United States v. Merritt, 478 F. Supp. 804, 805-06 (D.D.C. 1979); Shields v. Beto, 370 F.2d 1003, 1005-06 (5th Cir. 1967).
 
 
 [8]
 I realize that the presumption against the retroactive application of new laws is a judge-made rule and not a constitutional mandate. The Supreme Court's willingness to ignore constitutional claims on habeas in the interest of finality, however, shows how embedded the concept of finality is in American jurisprudence.
 
 
 [9]
 For the reasons stated in the previous section and the panel opinion, the State's interests do not trump Hawkins' fundamental right because they do not survive strict scrutiny.
 
 
 [10]
 I do not share the majority's confidence that clemency will be given in these cases. Given today's "get tough on crime rhetoric," it is speculative at best to suggest that deserving parolees will receive clemency.