# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03-4012

———————

Linda Bonebrake,

        Appellee,

v.

Larry Norris, (originally sued
McPherson Unit, Newport, Arkansas),

        Appellant.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Appeal from the United States
District Court for the
Eastern District of Arkansas.

———————

Submitted: October 18, 2004
Filed: August 9, 2005

———————

Before COLLOTON, LAY, and BENTON, Circuit Judges.

———————

COLLOTON, Circuit Judge.

Linda Bonebrake was convicted in the Yell County, Arkansas, Circuit Court of possession of a controlled substance with intent to deliver. She appealed her conviction without success, but was not incarcerated until over four years after the Arkansas Court of Appeals issued its mandate. Bonebrake filed an application for a writ of habeas corpus in federal court, and the district court granted the motion on the ground that the State's delay in seeking to execute the sentence amounted to a "waiver of jurisdiction" over Bonebrake. *Bonebrake v. Norris*, 319 F. Supp. 2d 928, 932 (E.D. Ark. 2003). The State appeals, and we reverse.

I.

On June 11, 1994, following a jury trial in Yell County Circuit Court, Bonebrake was found guilty of possession of a controlled substance with intent to deliver. She was sentenced to twenty years in the Arkansas Department of Corrections and assessed a fine of $2,000. On June 22, 1994, Bonebrake executed a bail bond and was released pending appeal. While awaiting the outcome of her appeal, Bonebrake consulted her counsel on several occasions regarding the status of her case. Her attorney advised her that when the appeal was resolved, the State would let him know and he would inform her, or the State would let her know directly.

The Arkansas Court of Appeals affirmed Bonebrake's conviction on December 6, 1995. *Bonebrake v. State*, 911 S.W.2d 261, 262 (Ark. Ct. App. 1995). The Yell County Circuit Court Clerk's Office received and filed the mandate affirming Bonebrake's conviction on December 29, 1995. The mandate included a provision explaining that unless Bonebrake surrendered herself forthwith, her bond would be forfeited.

At some point in December 1995 or early January 1996, the Yell County District Attorney, Bill Strait, received a copy of the opinion affirming Bonebrake's conviction. Strait was aware at the time that Bonebrake was free on bond pending appeal, but does not recall communicating with the clerk's office or taking any other action after receiving the opinion. Strait left office at the end of 1996 and does not recall giving his successor any information about the case or discussing the case with him. The prosecutor's office, moreover, did not have any procedure to track the case or alert anyone after the appeal was decided, or a procedure for apprehending a defendant after a mandate issued. Strait assumed it was a duty of other law enforcement to take the defendant into custody. The Yell County Circuit Court

Clerk's Office also failed to notify the sheriff after receiving the mandate.[1]  Neither Bonebrake's counsel nor any county official ever contacted Bonebrake regarding the resolution of her appeal.

In or about February 1999, Bonebrake's former brother-in-law, Tommy Smith, became angry at Bonebrake and inquired why Bonebrake was not incarcerated.  Smith spoke to Melinda Piatt of the clerk's office, who sent him to the prosecutor's office.  Smith was not able to speak with a prosecutor, but he spoke with a secretary who told him that if Bonebrake's appeal had been decided, then any resulting order would have been served.

At the time Bonebrake executed the bail bond, she lived in Russellville, about six miles from the location of the Yell County Circuit Court in Dardanelle.  Following that, Bonebrake lived in the Russellville area in Pope County and in neighboring Newton County, and worked in Russellville from 1996 through 2000.  The parties stipulated that during the period between her appeal and her eventual arrest, Bonebrake was not in hiding.  Bonebrake regularly encountered officers from the Pope County Sheriff's Office in the years between her appeal and her arrest, and she continued to visit a family doctor in Yell County.

Bonebrake was arrested in July 2000 by the Pope County Drug Task Force, but was released on the same day.  The record seems to indicate that this arrest was based on the 1994 conviction and sentence in Yell County, as opposed to alleged new criminal activity, but it does not explain what prompted Pope County authorities to act in July 2000, or why Bonebrake was released shortly after the arrest.  Less than

---

[1]Since then, according to a deputy clerk who testified, the clerk's office has adopted a procedure under which a deputy clerk file-marks the mandate, takes the mandate to the sheriff's office and bondsman, and makes a notation in a docket book showing where the mandate was sent and on what date it was sent.  319 F. Supp. 2d at 929.

a week later, Bonebrake read a front-page newspaper article that said she had been in hiding. Bonebrake then contacted the Yell County Sheriff's Office and turned herself in.

Bonebrake immediately began to serve her sentence in July 2000. On November 28, 2000, she filed her habeas corpus petition. Following two evidentiary hearings, the district court granted the petition on December 4, 2003.

II.

The district court granted Bonebrake's habeas petition based on what has come to be known as the "waiver theory" of jurisdiction. Under this interpretation of the Due Process Clause of the Fourteenth Amendment, introduced by the Fifth Circuit in *Shields v. Beto*, 370 F.2d 1003 (5th Cir. 1967), the State's "lack of interest" in effecting incarceration of a defendant is "equivalent to a pardon or commutation," and amounts to "a waiver of jurisdiction" that precludes the State from incarcerating the defendant. *Id*. at 1006. *Shields* involved what the court described as "28 years of inaction on the part of the State of Texas" between a conviction in 1933 and an effort in 1962 to require that Shields serve the balance of prison sentences imposed for the 1933 conviction.

Our court adopted the waiver theory in 1978, and remanded a habeas corpus action for an evidentiary hearing, where a criminal defendant's judgment and commitment forms "lay unexecuted in the hands of the Marshals for over seven years." *Shelton v. Ciccone*, 578 F.2d 1241, 1244 (8th Cir. 1978). We said that the defendant Shelton's allegations permitted "an inference that although aware of Shelton's whereabouts, the Marshals purposely or out of extreme neglect did not attempt to execute the judgment and commitment papers for seven years." *Id*. at 1245. Shelton's claims also suggested that the Marshals may have chosen finally to make an arrest in response to a civil action filed in the State of Tennessee, in which

Shelton's presence apparently was desired. Under these circumstances, our court held that "[s]uch inferences, if proven to be true, constitute gross negligence or an arbitrary and unwarranted exercise of their powers by the U.S. Marshals." *Id.* Applying the *Shields* rationale, we held that the record was sufficient to permit an inference that Shelton had been denied due process.

We later explained that the waiver theory is "premised on the fourteenth amendment's protection against arbitrary and capricious state action." *Camper v. Norris*, 36 F.3d 782, 784 (8th Cir. 1994). We emphasized that a habeas petitioner invoking the waiver theory bears a heavy burden to show that the "'state's action [was] so affirmatively wrong or its inaction so grossly negligent that it would be inconsistent with "fundamental principles of liberty and justice" to require a legal sentence to be served in the aftermath of such action or inaction.'" *Shelton*, 578 F.2d at 1244 (quoting *Piper v. Estelle*, 485 F.2d 245, 246 (5th Cir. 1973)). We rejected claims of a habeas petitioner in *Camper* who complained of a four-year delay in execution of his sentence, and of a petitioner in *Mathes v. Pierpont*, 725 F.2d 77 (8th Cir. 1984), who cited a seven-year lapse, because they did not meet the standard articulated in *Shelton*.

The district court granted habeas corpus relief in this case based on its conclusion that "the State's inaction was so grossly negligent that requiring [Bonebrake] to serve her sentence would be unequivocally inconsistent with fundamental principles of liberty and justice." 319 F. Supp. 2d at 932. In reaching this decision, the district court took into account the circuit clerk's office's failure to notify the sheriff after receiving the mandate, the lack of an effective record-keeping procedure in the prosecutor's office, the failure of the prosecutor to inform his successor about the case, the failure of the prosecutor's office to take action in light of Tommy Smith's inquiries, and the fact that Bonebrake was present in Yell County on several occasions after the mandate issued in Bonebrake's appeal. *Id.* The district

-5-

court found that Bonebrake was not responsible for the delay in her incarceration and was not aware that her appeal had been denied. *Id.*

In reviewing this conclusion, we must consider not only our precedent in *Shelton*, but also the Supreme Court's more recent decisions concerning the substantive protections of the Due Process Clause of the Fourteenth Amendment. The waiver theory developed in the 1960s under the rubric of substantive due process, and it was founded on the Fifth Circuit's application of Supreme Court decisions of the 1940s. *See Shields*, 370 F.2d at 1004 (citing *Buchalter v. New York*, 319 U.S. 427 (1943) and *Foster v. Illinois*, 332 U.S. 134 (1947)). Since then, the Supreme Court has defined more precisely the analysis required in cases alleging a violation of substantive rights based on the Due Process Clause.

In *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), the Court explained that in cases challenging executive action on substantive due process grounds, the "threshold question" is whether the behavior of the governmental officer is so egregious as to "shock the contemporary conscience." 523 U.S. at 847 n.8. The Court emphasized that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense," *id.* at 846 (internal quotation omitted), and that the Due Process Clause prevents official abuse of governmental power as an "instrument of oppression." *Id.* (internal quotation omitted). *Lewis* observed that "[h]istorically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property," *id.* at 849 (internal quotation omitted), but allowed that "mid-level fault," such as deliberate indifference, recklessness, or gross negligence could be egregious enough to "shock the conscience" in some contexts. *Id.*

Our application of *Shelton* must take into account these developments in the law. *See Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 838 (8th Cir. 1997). As the Fourth Circuit observed in *Hawkins v. Freeman*, 195 F.3d 732, 744 (4th Cir.

1999) (en banc), the "waiver theory" as first described by the Fifth Circuit seemed to require only "prolonged inaction" by the State to establish a substantive due process violation. The Fifth Circuit and our court later held that the State's conduct must be "so affirmatively wrong or its inaction so grossly negligent that it would be inconsistent with fundamental principles of liberty and justice to require a legal sentence to be served in the aftermath of such action or inaction." *Shelton*, 578 F.2d at 1244 (quoting *Piper*, 485 F.2d at 245). While this formulation "surely moved in the direction of the conscience-shocking standard mandated in *Lewis*, it as surely fails to embody the full stringency of that standard's requirement that to be 'conscience-shocking,' 'arbitrary in the constitutional sense,' an executive act must be not only 'wrong,' but egregiously so by reason of its abusive or oppressive purpose and its lack of justification by any government interest." *Hawkins*, 195 F.3d at 744.

The suggestion in *Shelton*, therefore, that "gross negligence" by law enforcement officials, resulting in a delay of incarceration, might preclude a State from executing a lawful sentence, must be harmonized with the teaching of *Lewis* that only "conscience-shocking" actions of executive officials will implicate the substantive component of the Due Process Clause. The required level of culpability depends on the context: "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking." 523 U.S. at 850.

We agree with the Fourth Circuit that a relatively high degree of culpability is required to shock the conscience in this context of delayed incarceration. As that court observed, "erroneous release (and delayed incarceration) of prisoners is a surprisingly widespread and recurring phenomenon in both state and federal systems." 195 F.3d at 742 & n.3. More importantly, in such cases, "the routine, seemingly invariable, executive practice has been to incarcerate, rejecting any claim

-7-

of entitlement to freedom." *Id*. at 743. These circumstances are relevant to our inquiry, because the Supreme Court instructed that the question whether executive action "shocks the conscience" should be answered in light of "an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them." *Lewis*, 523 U.S. at 847 n.8. The sort of administrative error that leads to delayed incarceration is "too frequently made in penal systems administration to raise any presumption of arbitrariness 'in the constitutional sense,' whenever it occurs," *Hawkins*, 195 F.3d at 744 (citation omitted), and the routine executive practice has been to remedy the error by incarcerating or reincarcerating the offender. In light of this history, "[t]o keep things in constitutional proportion, we would have to see . . . 'a mindless abuse of power,' or a deliberate exercise of power 'as an instrument of oppression,' or power exercised 'without any reasonable justification in the service of a legitimate governmental objective,'" before delayed incarceration would shock the conscience. *Id*. at 746 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 126 (1992), and *Lewis*, 523 U.S. at 846) (internal citation and alteration omitted)).

We conclude that the record is insufficient to establish a violation of Bonebrake's constitutional rights under the standard set in *Shelton*, and certainly when measured against the requirement that executive action must "shock the contemporary conscience." While the administrative failures involved in this case clearly were negligent, they do not rise to an egregious level that might qualify Bonebrake for relief under the Due Process Clause. The circumstances here involve a series of mistakes or failures to act on the part of the circuit clerk's office and the prosecutor's office that delayed Bonebrake's incarceration until several years after her conviction was affirmed. The four-year delay in this case, however, nowhere approaches the 28-year lapse that drove the Fifth Circuit's decision in *Shields*. Unlike the inference that supported our conclusion in *Shelton*, there is no finding here that the Yell County Sheriff's Office was aware of Bonebrake's whereabouts and the status of her case, and then purposely or out of extreme neglect failed to take action

-8-

for several years. *Shelton*, 578 F.2d at 1245. Nor is there a showing that Bonebrake ultimately was arrested only at a propitious time to serve the interests of law enforcement. *Id*.

We need not explore the nuances of the "gross negligence" standard discussed in our waiver theory cases, because the shortcomings displayed by Yell County authorities in this case do not satisfy the shocks-the-conscience standard of *Lewis*. "The Due Process Clause of the Fourteenth Amendment was intended to prevent the government from abusing its power, or employing it as an instrument of oppression." *Collins*, 503 U.S. at 126 (internal quotations omitted). No doubt there was negligence on the part of various county officials in this case, and perhaps even "gross negligence" as that nebulous term is defined in some jurisdictions. Lacking from the record, however, is a showing of mindlessly arbitrary or deliberately oppressive action by the State that might meet the rigorous standard of *Lewis* and the doctrine of substantive due process. We therefore conclude that our waiver theory cases, particularly when read in light of more recent Supreme Court precedent, do not support the granting of a writ.[2]

\*     \*     \*

The State concluded its oral argument by stating that "Ms. Bonebrake would have had and still does have a very good argument to make for clemency to the

---

[2]In light of our answer to the threshold question whether the executive action shocks the conscience, we need not consider whether Bonebrake could satisfy the second requirement that the government's conduct violate "one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Terrell v. Larson*, 396 F.3d 975, 978 n.1 (8th Cir. 2005) (en banc) (quoting *Moran v. Clarke*, 296 F.3d 638, 651 (8th Cir. 2002) (en banc) (opinion of Bye, J., for the court)); *cf. Hawkins*, 195 F.3d at 747-50 (concluding that the "waiver-of-jurisdiction theory" is not supported by a liberty interest regarded as fundamental).

governor, but she does not have a legal right to what she is claiming in this court." We express no view on the matter of clemency, but we agree with the State that the Due Process Clause of the Fourteenth Amendment does not provide a basis for the relief that Bonebrake seeks. We therefore reverse the district court's order granting a writ of habeas corpus.

LAY, Circuit Judge, concurring.

Although I agree with the majority's constitutional argument, I strongly agree with the State that Ms. Bonebrake should seek clemency from the Governor.

_____